# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DARRYL E. JOHNSON,
     Plaintiff,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
     Defendant.

No. 3:16-cv-01050 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Darryl E. Johnson moves to reverse the decision by

the Social Security Administration (SSA) denying him disability insurance benefits. The

Commissioner of Social Security moves to affirm the decision. Although I conclude that most of

Johnson's arguments for reversal lack merit, I hold that the Administrative Law Judge (ALJ)

failed to properly describe all of Johnson's limitations to the vocational expert. As a result of the

ALJ's omission, her finding that Johnson could perform other work was not supported by

substantial evidence. Therefore, I grant Johnson's motion and deny the Commissioner's.

## I.     Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the

administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts

Darryl E. Johnson applied for Social Security disability insurance benefits on December 28, 2012, alleging a period of disability from January 1, 2013. Statement of Stipulated Facts, Doc. No. 13-2, at 1. Johnson identified his disability as "[d]egenerative disc disease." *See* Disability Determination Explanation (Initial), R. at 145.

The SSA initially denied Johnson's claim on February 28, 2013, finding that although Johnson's "condition result[ed] in some limitations in [his] ability to perform work related activities, . . . th[o]se limitations d[id] not prevent [him] from performing work [he] ha[d] done

in the past." *Id.* at 153. In the agency's view, Johnson's condition was "not severe enough to keep [him] from working."[1] *Id.*

Johnson sought reconsideration, alleging that he also suffered from a hand injury and cognitive impairment. The SSA adhered to its decision upon reconsideration on September 12, 2013.[2] Disability Determination Explanation (Reconsideration), R. at 177.

Johnson requested a hearing before an ALJ, which was held on February 4, 2015. Tr. of ALJ Hr'g, R. at 68. At the hearing, ALJ Sharda Singh questioned Johnson about his conditions and treatment history, particularly asking "how much weight . . . [he] th[ought] [he] c[ould] lift and carry comfortably," and "[h]ow long or . . . how far . . . [he] th[ought] [he] c[ould] stand or walk." *Id.* at 112. Johnson replied that he could lift only "somewhere between five and 10 pounds," could stand only for "15, 20 minutes," and rarely walked. *Id.* at 112–13.

The ALJ then heard testimony from two vocational experts, one for Johnson, Jeff R. Blank, PhD, and one for the SSA, Steven B. Sachs, PhD. Johnson's attorney questioned Dr. Blank first. She described Johnson as "closely approaching advanced age, ha[ving] completed a

---

[1] The SSA consultant, Rafael S. Wurzel, MD, deemed Johnson's statements regarding his symptoms only "[p]artially [c]redible" because his "ability to do work related activities" was only "mildly to moderately limited." Disability Determination Explanation (Initial), R. at 149–50. He assigned Johnson "exertional limitations" of occasionally lifting or carrying 20 pounds and frequently lifting or carrying 10 pounds, but concluded that "th[o]se limitations would not prevent [Johnson] from performing past relevant work." *Id.* at 150, 152.

[2] Carol R. Honeychurch, MD—the SSA consultant at the reconsideration level—agreed with Dr. Wurzel that Johnson was only "[p]artially [c]redible" because his physicians, Pietro A. Memmo, MD, and Robert L. Reginio, MD, gave him only "mild–moderate restrictions." Disability Determination Explanation (Reconsideration), R. at 171. She particularly noted Dr. Memmo's statement that "the level of pain and debility that [Johnson] is reporting is out of proportion with objective radiological findings." *Id.* at 157. A psychological consultant, Warren Leib, PhD, also considered Johnson's file and concluded that Johnson had "a credibility issue" because his "symptoms [were] out of proportion to evidence," and he was "unable to determine etiology [of] most of [Johnson's] complaints."

high school education with specific vocational training . . . , and his work history being self-employed as a freight broker at the sedentary exertion level." *Id.* at 121. Johnson's counsel then asked, "Assuming . . . [Johnson] experiences fatigue to the extent that he or she is required to take multiple breaks during an eight-hour work day, are there jobs available for him in the local economy?" *Id.* at 123. Dr. Blank replied, "That description of an individual would not be consistent with competitive work, so I would not expect [] Johnson to be able to perform any of his past . . . positions or other positions given those limitations." *Id.* at 124. After Johnson's attorney added furthers restriction of needing "to nap during that time period" and "experienc[ing] pain that interferes with his ability to work and complete tasks on time," Dr. Blank concluded that "clearly there would be no work for such a person." *Id.* at 124–25.

ALJ Singh called the SSA's vocational expert, Dr. Sachs. Dr. Sachs characterized Johnson's past work as "sedentary" and "light." *Id.* at 135. The ALJ asked Dr. Sachs to "assum[e] . . . an individual [with] the same education and past work experience as [Johnson]," who could "lift and carry 20 pounds occasionally, [and] 10 pounds frequently; stand and walk for six hours and sit for six hours with a sit/stand option; . . . never climb ladders, ropes, or scaffolds; occasionally climb ramps, stairs, balance, stoop, kneel, courch, and crawl; . . . [and be] further limited to understanding, remembering, and carrying out simple, routine, repetitive, non-complex tasks." *Id.* 138. She also asked Dr. Sachs to limit the hypothetical person to "avoid[ing] concentrated exposures to hazards." *Id.* at 139. Dr. Sachs opined that, although such a person could not perform Johnson's past jobs, he could find work as a "receptionist, . . . general office clerk, . . . [or] as a production inspector." *Id.* With the further limitations of "frequent limitations in . . . gross hand manipulations of the left upper extremity"—Johnson's non-dominant hand—

Dr. Sachs concluded that "the work as a receptionist and general officer clerk could be performed," but not the work as a production inspector. *Id.* at 139–40. When the ALJ asked if such a person could find work if they "would be off task for more than 15 percent of the work day and would need to take a nap during the day for . . . about half an hour," Dr. Sachs responded, "No."[3] *Id.* at 140.

On February 27, 2015, the ALJ issued an opinion in which she found that Johnson "ha[d] not been under a disability, as defined in the Social Security Act, from January 1, 2013, through the date of th[e] decision." ALJ Decision, R. at 55. At the first step, the ALJ found that Johnson "ha[d] not engaged in any substantial gainful activity since January 1, 2013, the alleged onset date." *Id.* at 40. At the second step, the ALJ found that Johnson's "degenerative disc disease, depression, encephalopathy, and fibromyalgia" were "severe impairments" that "cause[d] a more than minimal impact on the claimant's ability to maintain and perform basic work activities."[4] *Id.* At the third step, the ALJ determined that Johnson's impairments were not per se disabling because Johnson "d[id] not have an impairment or combination of impairments that medically me[t] or equal[ed] a listed impairment." *Id.* at 42.

The ALJ then assessed Johnson's residual functional capacity, and found that he could "perform light work," with certain limitations. Those limitations were that Johnson (1) was "able

---

[3] The ALJ also asked about a hypothetical person who was "limited to lifting and carrying 10 pounds occasionally and less than 10 pounds frequently; standing and walking for two hyours and sitting for up to six hours in an eight-hour day," and "all the same limitations . . . used in [the] prior hypo[thetical]s." Tr. of ALJ Hr'g, R. at 140. Dr. Sachs replied that such a person could not perform any of Johnson's past jobs, and the ALJ did not inquire further because such a person would be classified as disabled under the Medical-Vocational Grids. *Id.* at 140–41.

[4] The ALJ ruled that Johnson's "sleep apnea" and "obesity" were "non-severe impairments as they d[id] not *more than minimally* affect the claimant's ability to perform basic work activities," even when their "effects on the claimant's other severe impairments . . . [were] taken into account." ALJ Decision, R. at 40 n.1 & 41.

to lift and carry [only] up to 20 pounds occasionally, and up to 10 pounds frequently," (2) could only "stand or walk for up to 6 hours of an 8 hour workday, [and] sit for up to 6 hours of an 8 hour workday," (3) needed to "alternate sitting and standing at will throughout the workday," (4) could "never climb ladder[s], ropes, or scaffolds," (5) could "occasionally climb ramps and stairs," and (6) could "occasionally balance, stoop, kneel, crouch, and crawl." ALJ Singh also limited Johnson to "understanding, remembering, and carrying out simple, routine, repetitive, noncomplex tasks," and "frequently perform[ing] fine and gross hand manipulations with the upper left non-dominant extremity." *Id.* at 45. Finally, she held that he "should avoid concentrated exposure to hazards." *Id.*

Although Johnson's "residual functional capacity preclude[d] performance of [his] past relevant work," ALJ Singh concluded that "there are jobs that exist in significant numbers in the national economy that [Johnson] c[ould] perform." *Id.* at 54. "Based on the testimony of the vocational expert"—i.e., Dr. Sachs—the ALJ ruled that Johnson was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 55."A finding of 'not disabled [was] therefore appropriate," and the ALJ denied Johnson's request for disability benefits. *Id.*

Johnson requested a review of the ALJ's decision by the SSA's Appeals Council on April 28, 2015. Request for Review of Hearing Decision/Order, R. at 20. Holding that there was "no reason . . . to review the [ALJ]'s decision," the Appeals Counsel "denied [Johnson's] request for review" on May 23, 2016. Notice of Appeals Council Action, R. at 1. Johnson then filed a complaint before this court urging me to reverse the Commissioner's decision on June 27, 2016. Compl., Doc. No. 1.

### III.    Discussion

On review, Johnson asserts that the ALJ's "decision is not based on substantial evidence" and that "the Commissioner erred as a matter of law." Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 1. Specifically, he contends the ALJ's residual functional capacity determination "was not supported by substantial evidence," *id.* at 3; that the ALJ "erred in her determination that [] Johnson lacked credibility," *id.* at 7; that the ALJ wrongly "gave 'great weight' to the opinions of non-examining state agency medical advisors" and less weight to some of "the opinions of the treating physicians," *id.* at 13, 14; that the ALJ incorrectly "rejected the [v]ocational experts' testimony that [] Johnson would be unable to sustain employment"; and that the ALJ erroneously "did not use all of the limitations in her own [residual functional capacity determination] when questioning the second vocational expert, Dr. Sachs." *Id.* at 22. The Commissioner responds that the ALJ's "findings are supported by substantial evidence and made by a correct application of legal principles," and should be affirmed. Mot. Affirm, Doc. No. 22, at 1.

### A.    <u>Was the ALJ's residual functional capacity determination supported by substantial evidence?</u>

Johnson argues that the ALJ's residual functional capacity determination was not supported by substantial evidence because it "did not include limitations for all of [Johnson's] severe impairments." Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 4. In particular, Johnson asserts that ALJ's limitation to "understanding, remembering, and carrying out simple, routine, repetitive, [and] noncomplex tasks, would be appropriate if he had a low IQ but . . . does not address whether he would be off task for a percentage of the day due to his pain, loss of concentration, or . . . need for naps and frequent breaks." *Id.* Johnson also disputes the ALJ's finding that he "is frequently able to perform fine and gross manipulations with . . . his left

hand," a conclusion, he contends, that was supported by "[n]one of his doctors, nor even the state agency non-examining consultants." *Id.* at 5. The Commissioner responds that the ALJ's residual functional capacity findings are adequately "supported by substantial evidence." Mem. Supp. Mot. Affirm, Doc. No. 22, at 5. I agree with the Commissioner, and therefore affirm the ALJ's residual functional capacity findings.

Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's 'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by his impairment." *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. § 404.1520(b)). The ALJ's determination need not "perfectly correspond with" any medical source opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Rather, the ALJ is "entitled to weigh all of the evidence available to make a[] . . . finding that [is] consistent with the record as a whole." *Id.* In assessing a claimant's residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss[ing] the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describ[ing] the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record." Social Security Ruling 96-8p, 1996 WL 374184, at *7. Finally, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In making a residual functional capacity determination in the present case, ALJ Singh

extensively considered Johnson's complaints as well as his voluminous medical records. She noted that an MRI taken on January 31, 2013, "showed only a mild disc bulge and mild degenerative disc disease"; that a later MRI and EEG taken on July 3, 2013 "revealed no abnormalities despite complaints of cognitive disturbance and memory problems"; and that Johnson's physiatrist, Pietro R. Memmo, MD, told Johnson in June 2013 that "the objective studies were all normal, his neurological exam was completely normal, and . . . that his level of pain was out of proportion to the objective findings." ALJ Decision, R. at 46–47 (citing Letter from Pietro A. Memmo, MD to Robert Reginio, MD (June 28, 2013), R. at 701 ("[T]he level of pain and debility that [Johnson] is reporting is out of proportion with objective radiological findings.")). Around that same time, a neurosurgeon, David A. Kvam, MD, found that Johnson "had normal gait, no difficulty heel walking, no difficulty independent toe standing, [and] no difficulty with tandem walking," and that his "muscle tone, sensation testing, and reflexes were all normal." *Id.* at 47 (citing Treatment Note by David A. Kvam, MD (June 6, 2013), R. at 696, 698 ("The complaint is moderate. . . . A normal neurological examination.")). The ALJ also pointed to an examination by Johnson's psychologist, Randall E. Weeks, PhD, in September 2014, which "indicated that there was no neurologic explanation of [Johnson]'s subjective complaints" and that a battery of psychological tests "failed to find any areas of impairment or significant cognitive decline." *Id.* (citing Letter from Randall E. Weeks, PhD, to Peter McAllister, MD (Sept. 15, 2014), R. at 269–70 ("Test data failed to find any areas of impairment or significant cognitive decline. The pattern of test results did not indicate a neurological explanation for [Johnson's] subjective cognitive complaints.").

Other of Johnson's doctors took a more severe view of his impairments. Johnson's

neurologist, Peter McAllister, wrote a letter at Johnson's attorney's request expressing his "strong clinical suspicion" that Johnson's "constellation of cognitive complaints, profound fatigue and widespread pain represent fibromyalgia." Letter from Peter McAllister, MD to Anne Hoyt (May 28, 2014), R. at 873. In another letter written at Johnson's attorney's request, Dr. McAllister opined that Johnson "would need to take multiple breaks to rest (or even nap) throughout the day," that "[h]is current average daily pain level would generally be sufficient to interfere with his ability to work, and to complete tasks on time," and that "[h]is fatigue and cognitive issues would likely increase his chance of errors at work." Letter form Peter McAllister, MD (Jan. 23, 2015), R. at 971. Dr. McAllister's treatment notes also indicated that Johnson complained of "[c]hronic fatigue, 'since the'80's,' . . . but worse in [the] last 12 months," and that an examination found "widespread tender points on an otherwise normal exam." Treatment Note by Peter McAllister, MD (Apr. 14, 2014), R. at 874. The ALJ gave "[l]ittle weight" to Dr. McAllister's opinions, concluding that they were "out of proportion to his treatment notes as well as the treatment notes and opinions of other providers," and in some cases were also internally "inconsistent."[5] ALJ Decision, R. at 51–52.

With regard to Johnson's own complaints, ALJ Singh gave them some weight, but concluded that Johnson's "testimony . . . concerning the severity of the . . . impairments [was] not entirely consistent with the medical evidence of record, and as such, [was] not fully credible." *Id.* at 46. For instance, "despite [Johnson]'s complaints regarding his inability to concentrate and cognitive issues," the ALJ observed that "he has adequately advocated for

---

[5] For example, on one form, Dr. McAllister "note[d] that [Johnson] could never lift more than one pound, but in another part of th[e] same form he check[ed] off a box which indicate[d] that [Johnson] c[ould] carry less than 10 pounds." ALJ Decision, R. at 52 (citing Attending Physicians Statement by Peter McAllister, MD (Sept. 17, 2014), R. at 943).

himself against his private insurance carrier by detailing his treatments to them via written correspondence and gathering third party statement[s] to support his case." *Id.* Furthermore, "despite [Johnson]'s testimony that he sleeps for most of the day, is able to lift 5–10 pounds, sit for up to 30 minutes, stand for 15–20 minutes, is chronically fatigued, has difficulty holding objects, and does not do much walking, he also testified and indicated to providers that he was able to exercise and lost 100 pounds, which included weightlifting." *Id.* at 46–47. Hence, the ALJ correctly "t[ook] the claimant's reports of pain and other limitations into account" and "exercise[d] discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam). She did not, and "[was] not required to[,] accept the claimant's subjective complaints without question." *Id.*; *cf. Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (summary order) ("treating physician's opinions . . . based upon plaintiff's subjective complaints of pain and unremarkable objective tests" were "not 'well supported by medically acceptable clinical and laboratory diagnostic techniques'" and not entitled to "controlling weight") (citing 20 C.F.R. §§ 404.1527(d)(2) , 416.927(d)(2)); *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order) ("[W]here the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the court] must defer to his findings.").

In short, Johnson's case presented a significant quantity of conflicting medical evidence, with largely normal test results and doctors who disagreed on the nature, severity, and cause of his symptoms. Because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," the ALJ was entitled to "choose between properly submitted medical opinions" and to consider "other substantial evidence in the record, such as . . . a negative MRI," in determining

Johnson's residual functional capacity. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Although ALJ Singh apparently thought that Johnson plausibly could be characterized as able "to perform the full range of light work"—in which case "a finding of 'not disabled' would be directed" by the Medical-Vocational Guidelines—she took his subjective complaints into account and held that Johnson's "ability to perform . . . substantially all of the requirements of th[at] level of work ha[d] been impeded by additional limitations." ALJ Decision, R. at 55. In crafting those limitations, the ALJ relied on substantial evidence in the form of Johnson's testimony, *id.* at 45–47, "diagnostic testing," *id.* at 47, "[t]reatment notes," *id.* at 48, and "opinions" by consultative and examining physicians. *Id.* at 50–53.

Johnson nevertheless objects that the ALJ "did not include limitations for . . . his inability to complete tasks in a timely manner," or "his inability to maintain sustained work activity [eight] hours a day, [five] days a week." *See* Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 4. Those criticisms, however, simply reflect Johnson's disagreement with the relative weight the ALJ placed on his additional limitations. "[O]nce an ALJ finds facts, [I] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotation marks omitted). Here, I hold that a reasonable factfinder need not perforce conclude that Johnson requires limitations for "inability to complete tasks in a timely manner" and "inability to maintain sustained work activity." *Contra* Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 4. Thus, I affirm the ALJ's findings in those respects.

Johnson also contends that the ALJ erred by "determin[ing] that [] Johnson is frequently able to perform fine and gross manipulations with [] his left hand," because "[n]one of his

doctors, nor even the state agency non-examining consultants, opined that [Johnson] could 'frequently' use his left hand." Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 5. But the doctors' opinions were hardly unanimous with regard to Johnson's manipulative limitations. Two of Johnson's treating physicians, Dr. McAllister and Dr. Robbins, "assessed [Johnson] to be limited to 33 [percent] of an [eight] hour day in his ability to reach, perform computer keyboarding, or use a mouse," which would equate to "occasionally" performing fine and gross manipulations under Social Security regulations. *See id.* at 5–6 (citing Attending Physicians Statements, R. at 943, 948). One of the state agency medical consultants, Dr. Honeychurch, agreed that Johnson was "limited to only 'occasional' fingering with his left upper extremity." *Id.* at 6 (citing Disability Determination Explanation (Reconsideration), R. at 173). But—as Johnson himself admits—the other state agency medical consultant, Dr. Wurzel, "opined that [Johnson] had no manipulative limitations." *Id.* (citing Disability Determination Explanation (Initial), R. at 151). The ALJ rationally could compare those opinions and conclude that Johnson's manipulative limitation was properly set somewhere between "occasional" use and no limitation at all—in other words, at "frequent" use. *See Veino*, 312 F.3d at 588 ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (per curiam) ("[T]he report of a consultative physician may constitute [substantial] evidence."). Even if "the administrative record may also adequately support" the conclusion that Johnson was limited to "occasional" use of his hand, the ALJ's "contrary finding[]" is supported by substantial evidence and "must be given conclusive effect." *See Genier*, 606 F.3d at 49.

Under that "very deferential standard of review," I consider the ALJ's residual functional capacity finding to have been based on "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Id.* at 448; *Greek*, 802 F.3d at 375. Therefore, because "there is substantial evidence to support the determination," I affirm the ALJ's decision on that point. *See Selian*, 708 F.3d at 417.

B. <u>Did the ALJ properly find that Johnson lacked credibility?</u>

Johnson also argues that the ALJ wrongly "determin[ed] that [] Johnson lacked credibility" and improperly "rejected the parts of [] Johnson's testimony that he sleeps for most of the day and is chronically fatigued." Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 7–8. The Commissioner responds that the ALJ correctly exercised her "discretion to evaluate [Johnson]'s credibility in light of the evidence of the record." Mem. Supp. Mot. Affirm, Doc. No. 22, at 12.

Under SSA regulations, "[w]hen determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account." *Genier*, 606 F.3d at 49. The ALJ is not, however, "required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* "Credibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Off. of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted); *see Aponte*, 728 F.2d at 591 ("If the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."). I do not consider the the ALJ's credibility findings to have been "patently unreasonable" or unsupported by "substantial evidence," and therefore affirm them. *See Pietrunti*, 119 F.3d at 1042; *Aponte*, 728 F.2d at 591.

SSA regulations "provide a two-step process for evaluating a claimant's assertions of

pain and other limitations." *Genier*, 606 F.3d at 49. "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record,'" after taking into account "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [h e] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." *Id.* (quoting 20 C.F.R. § 404.1512(b)(1)(iii)). Ultimately, "[a]s a fact-finder, the ALJ has the discretion to evaluate the credibility of a claimant," *Pietrunti*, 119 F.3d at 1042 (internal quotation marks omitted), and "[i]t is the function of the [ALJ], not the reviewing courts, . . . to appraise the credibility of witnesses, including the claimant," *Aponte*, 728 F.2d at 591 (brackets omitted).

In the instant case, the ALJ found that Johnson suffered from the "severe impairments" of "degenerative disc disease, depression, encephalopathy, and fibromyalgia," ALJ Decision, R. at 40, and so apparently determined that Johnson "suffer[ed] from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."[6] *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). At the second stage, however, the ALJ concluded that Johnson's claimed symptoms could not "reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *See Genier*, 606 F.3d at 49 (internal

---

[6] The ALJ discounted Johnson's complaints with regard to other disorders, such as sleep apnea and obesity. *See* ALJ Decision, R. at 40 n.1 & 41. Johnson does not appear to have challenged her decision with regard to those illnesses.

quotation marks omitted). She noted, for instance, that notwithstanding Johnson's repeated "complaints regarding his inability to concentrate and cognitive issues," neurological exams over a period of nearly two years "failed to find any areas of impairment or significant cognitive decline." *See* ALJ Decision, R. at 46. Physical exams over the same period were likewise "normal" and failed to substantiate Johnson's claims of intense pain, to the extent that one of Johnson's own doctors "advised [him] that [the] level of pain and debility that he was reporting was out of proportion with objective radiological findings." *Id.* at 47.

So too, the ALJ found Johnson's testimony inconsistent with "other statements with respect to his daily activities." *See Genier*, 606 F.3d at 50. For example, "[d]espite [Johnson]'s testimony that he sleeps for most of the day, is able to lift 5–10 pounds, sit for up to 30 minutes, stand for 15–20 minutes, is chronically fatigued, has difficultly holding objects, and does not do much walking," Johnson was able to lose 100 pounds through diet and exercise, and was described by his nutritionist as "one of [her] top [three] clients in his dedication to weight loss and desire to regain his health." ALJ Decision, R. at 46–47; *see* Letter from Rita Anderson (Dec. 2, 2013), R. at 793; *see also* Progress Notes by Rita Anderson, R. at 795 (reporting that Johnson performed "moderate exercise"). Johnson also reported that he completed "stretching exercises" several times per day, Activities of Daily Living (Jan. 14, 2013), R. at 319; "daily" cooked "complete nutritional meals as recommended by [his] dietician for weight loss," *id.* at 321; "[d]aily" walked and drove alone outside, *id.* at 322; and could "lift 20 to 25 pounds." *Id.* at 324. "[A] claimant need not be an invalid to be found disabled under the Social Security Act," *Balsamo*, 142 F.3d at 81, but the ALJ reasonably could have found that Johnson's relatively high level of activity, his impressive weight loss, and his ordinary medical records "weighed against a

positive credibility finding [with regard] to [Johnson]'s subjective assessment of the intensity of his symptoms." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order); *Calabrese*, 358 F. App'x at 277–78 ("[T]he ALJ's adverse credibility finding was . . . amply supported by evidence that [the claimant] . . . admitted her ability to cook, clean, do laundry, shop, and handle her own finances despite her professed claims of disabling and continuous pain and mental confusion."). Hence, "the ALJ's decision to discount [Johnson]'s subjective complaints is supported by substantial evidence." *See Calabrese*, 358 F. App'x at 278.

Johnson insists that "it is just wrong to fault a person for following doctors' recommendations to improve [his] health," Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 11, but that confuses the issue. To be sure, the Second Circuit has stated that "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals, . . . it would be a shame to hold th[at] endurance against him in determining benefits *unless his conduct truly showed that he is capable of working*." *Balsamo*, 142 F.3d at 81–82 (emphasis added). But the question is not simply whether Johnson "reported pain" or was otherwise negatively impacted by his condition, for "disability requires more than mere inability to work without pain." *See Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983); *Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013) (summary order). "To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude *any* substantial gainful employment." *Dumas*, 712 F.2d at 1552 (emphasis added). Here, the ALJ considered Johnson's subjective complaints, his doctors' opinions, and the medical record as a whole, and concluded that Johnson was "capable of working" because his limitations did not "preclude any substantial gainful employment." *See Balsamo*, 142 F.3d at 82; *Dumas*, 712 F.2d at 1552. Because "[t]here was substantial medical

evidence in the record that supported the ALJ's determination that [Johnson] was able to undertake a variety of physical tasks, and it is clear that the ALJ took into consideration [Johnson]'s legitimate limitations . . . [in] the [residual functional capacity] determination," I affirm the ALJ's appraisal of Johnson's credibility. *See Prince*, 490 F. App'x at 400.

C. Did the ALJ correctly evaluate the medical opinion evidence?

Johnson challenges the ALJ's treatment of the medical opinion evidence on two fronts. First, he objects to the ALJ's decision to "g[ive] great weight to the opinions of [state] non-examining physicians." Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 13. Second, he argues that the ALJ incorrectly gave only "limited" and "partial weight" to the opinions of two of Johnson's treating physicians, Dr. McAllister and Dr. Robbins. *Id.* at 15. The Commissioner replies that the ALJ "appropriately assigned the[] [s]tate agency physician and psychological opinions great weight" and "provided lengthy discussions of her reasons for affording less than controlling weight to the [treating] physician opinions." Mem. Supp. Mot. Affirm, Doc. No. 22, at 6, 8. With regard to both sets of opinions, I affirm the ALJ's ruling.

"The treating physician rule provides that an ALJ should defer to 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."[7] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. §

---

[7] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

404.1527(c)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned, *Burgess*, 537 F.3d at 129. But "where the ALJ's reasoning and adherence to the regulation are clear," the ALJ need not "slavish[ly] recite[] each and every factor" listed in the regulations. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence" that, if it "contradict[s]" the opinion of a treating physician, renders the latter "not binding." *See Mongeur*, 722 F.2d at 1039; *see also Prince*, 490 F. App'x at 401 ("[C]onsultative examinations were still rightly weighed as medical evidence."); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("The report of a consultative physician may constitute . . . substantial evidence."). The question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the

consultative physicians—Dr. Honeychurch, Dr. Wurzel, and Dr. Leib—more heavily than the opinions of Johnson's treating physicians. *See Burgess*, 537 F.3d at 129.

The ALJ stated that she "gave great weight to the opinions of the [state] non-examining physicians" because they "were all consistent with [her] findings regarding residual functional capacity, and . . . were also consistent with the medical evidence of record." ALJ Decision, R. at 50. Although the physicians "were not able to treat the claimant, they had the opportunity to review much of the evidence in the file," and their opinions were "consistent with the [medical] evidence" and the opinions of two of Johnson's treating physicians, Dr. Memmo and Dr. Weeks. *Id.* (citing Letter from Pietro A. Memmo, MD to Robert Reginio, MD (June 28, 2013), R. at 701 (stating that he "advised [Johnson] that the level of pain and debility that he [was] reporting [was] out of proportion with objective radiological findings"); Letter from Randall E. Weeks, PhD, to Peter McAllister, MD (Sept. 15, 2014), R. at 269–70 (reporting that "[t]est data failed to find any areas of impairment or significant cognitive decline" and that "test results did not indicate a neurological explanation for [Johnson's] subjective cognitive complaints")).

Conversely, the ALJ assigned "[l]ittle weight" to the opinions of Dr. McAllister because they were "out of proportion to his treatment notes as well as the treatment notes and opinions of other providers." *Id.* at 51. For example, on May 28, 2014—the same day that he wrote a letter at Johnson's attorney's request reporting that Johnson's "fatigue and encephalopathy . . . continue[d] to cause significant functional disability," *see* Letter from Peter McAllister, MD to Anne Hoyt (May 28, 2014), R. at 873—Dr. McAllister recorded in a treatment note that Johnson's back exhibited "no tenderness" and that he had "[n]ormal affect, memory, mentation, speech and language function," and had "[n]ormal motor tone, bulk and strength throughout."

Treatment Note by Peter McAllister, MD (May 28, 2014), R. at 876. Likewise, the ALJ gave only "[p]artial weight" to the opinion of Dr. Robbins because his "opinion was . . . inconsistent with the treatment notes contained in the record." ALJ Decision, R. at 52. Dr. Robbins issued a very restrictive opinion despite "diagnostic testing, which revealed no significant abnormalities, as well as Dr. Robbins'[s] own treatment notes[,] which indicated that [Johnson]'s brain MRI revealed no abnormalities." *Id.* at 52–53. Both Dr. McAllister's and Dr. Robbins's opinions were inconsistent with those of Johnson's other treating physicians, such as his neurosurgeon, Dr. Kvam, and his infectious disease specialist, Lisa Chirch, MD (who "examined [Johnson] but found no musculoskeletal, neurological, or psychiatric abnormalities").[8] *Id.* at 53.

The inconsistencies between the opinions of Dr. McAllister and Dr. Robbins, on the one hand, and their treatment notes and the opinions of other physicians, on the other, presented a "[g]enuine conflict[] in the medical evidence . . . for the Commissioner to resolve." *See Burgess*, 537 F.3d at 128. As the Second Circuit recently held, where a doctor's opinion is "in conflict with content in that doctor's own clinical notes, and in conflict with the opinion of [other physicians]," those factors "constitute 'good reasons' for the limited weight attributed." *Camille v. Colvin*, 562 F. App'x 25, 27 (2d Cir. 2016) (summary order). Furthermore, even if "the record contains evidence" that might support Dr. McAllister's and Dr. Robbins's opinions, it also "contains substantial evidence supporting the conclusion[s]" drawn by the other treating physicians and by the ALJ. *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 76 (2d Cir. 2012) (summary order). Because "[i]t is not [my] function to determine *de novo* whether [Depoto] is

---

[8] The ALJ did err, however, in stating that "Dr. Robbins'[s] report is inconsistent with itself in that he indicates the claimant can walk for 30 minutes . . . [but] could only stand for 20 minutes." *See* ALJ Decision, R. at 52. As anyone who has spent a day at a museum can attest, it is entirely possible for a person to be tired more by standing still for an extended period than by walking.

22

disabled," *Brault*, 683 F.3d at 447, nor "to resolve evidentiary conflicts" in the record, *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), I affirm the ALJ's decision not to give controlling weight to Dr. McAllister's and Dr. Robbins's opinions.

For the same reasons, I conclude that—after he decided not to give Dr. McAllister's and Dr. Robbins's opinions controlling weight—ALJ Singh properly evaluated the persuasiveness of the opinions under the factors listed in 20 C.F.R. § 404.1527(c)(2)–(6). "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013). Here, the ALJ was sufficiently specific in writing that Dr. McAllister's and Dr. Robbins's opinions were "all out of proportion to [their] treatment notes" and the "opinions of other providers," including Johnson's other treating physicians. *See* ALJ Decision, R. at 51; *Camille*, 562 F. App'x at 28 ("The ALJ was permitted to consider Dr. [McAllister]'s treatment notes in weighing the opinions of Dr. [McAllister] and [the other sources]; and []he was permitted to conclude that [the other doctors'] opinions w[ere] more reliable."). Hence, I affirm the ALJ with regard to his treatment of the doctors' medical opinions.

D. <u>Did the ALJ properly consider the vocational experts' testimony?</u>

Johnson further argues that the ALJ incorrectly "reject[ed] both of the vocational experts' testimony." Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 23. Johnson notes that "[w]hen . . . limitations" concerning Johnson's "need for naps and frequent breaks, his inability to remain on task or to complete tasks in a timely manner, and his inability to maintain sustained work activity [eight] hours a day, [five] days a week" were "addressed to the vocational experts, they both testified that there would be no work." *Id.* at 23. The Commissioner responds that "it was not

necessary for the ALJ to include in her hypothetical question to the vocational expert, symptoms and limitations [that] the ALJ reasonably rejected." Mem. Supp. Mot. Affirm, Doc. No. 22, at 13. The Commissioner is correct.

"The ALJ," not the vocational expert, "is responsible for determining, based on all the evidence, the claimant's physical capabilities." *Dumas*, 712 F.2d at 1554 n.4. Here, after considering Johnson's physical capabilities, the ALJ declined to limit him to requiring frequent breaks and being unable to remain on task. As noted above, that residual functional capacity finding was supported by substantial evidence. *See id.* at 1554. Having determined Johnson's residual functional capacity, "the ALJ properly declined to include in [her] hypothetical question symptoms and limitations that [s]he had reasonably rejected," and an opinion by the vocational expert based on those discredited symptoms does not provide grounds to reverse the ALJ's decision. *See Priel v. Astrue*, 453 F. App'x 84, 87–88 (2d Cir. 2011) (summary order).

E. <u>Did the ALJ accurately describe Johnson's functional limitations when questioning the vocational experts?</u>

Johnson identifies one final basis for reversal. The ALJ's residual functional capacity finding limited Johnson to "frequently perform[ing] fine and gross hand manipulations with the upper left non-dominant extremity." ALJ Decision, R. at 45. At the hearing, however, the ALJ only asked the vocational expert, Dr. Sachs, to consider a hypothetical person with a limitation to "frequent . . . *gross* hand manipulations of the left upper extremity." ALJ Hr'g Tr., R. at 139 (emphasis added). Johnson contends that was error. Mem. Supp. Mot. Reverse, Doc. No. 13-1, at 24. I agree, and remand to the Commissioner for further development of the record.

After a claimant has proved that his or her residual functional capacity precludes a return to "past relevant work," *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. §§ 404.1520(e), (f),

404.1560(b)), there is a "limited burden shift" to the Commissioner to show that "there is work in the national economy that the claimant can do." *Poupore*, 566 F.3d at 306. The ALJ may carry that burden "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). "A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations." *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 229 (N.D.N.Y. 2015) (citing *Dumas*, 712 F.2d at 1553–54). For the vocational expert's testimony "to be considered reliable," however, "the hypothetical posed must include *all* of the claimant's functional limitations . . . supported by the record." *Horbock v. Barnhart*, 210 F. Supp. 2d 125, 134 (D. Conn. 2002) (quoting *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir. 1995)).

If the ALJ "ask[s] the vocational expert a hypothetical question that fail[s] to include or otherwise implicitly account for all of [the claimant]'s impairments," then "the vocational expert's testimony is not 'substantial evidence' and cannot support the ALJ's conclusion that [the claimant] c[an] perform significant numbers of jobs in the national economy." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011); *see also Lancaster v. Comm'r of Soc. Sec.*, 228 F. App'x 563, 573 (6th Cir. 2007) (unpublished) ("If the hypothetical question does not accurately portray Plaintiff's physical and mental state, [then] the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work."); *Medovich v. Colvin*, 2015 WL 1310310, at *14 (N.D.N.Y. Mar. 23, 2015) ("[E]xpert vocational testimony given in response to hypothetical questions that do not present the full extent of claimants' impairments,

limitations[,] and restrictions . . . cannot constitute substantial evidence to support a conclusion of no disability."). In such circumstances, the ALJ's decision may be upheld only if the error was "harmless," that is, if other "substantial evidence in the record" supports the ALJ's conclusions. *See McIntyre*, 758 F.3d at 152; *cf. Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008).

Here, ALJ Singh did not fully describe Johnson's residual functional capacity to Dr. Sachs. The ALJ found that Johnson was limited to "frequent[] . . . *fine and gross* hand manipulations," ALJ Decision, R. at 45, but she asked the vocational expert only to consider "frequent . . . *gross* hand manipulations." ALJ Hr'g Tr., R. at 139 (emphasis added). The distinction is not inconsequential: Social Security regulations indicate that "gross manipulation involves reaching (extending the hands and arms in any direction), and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands," whereas "fine manipulation involves fingering (picking, pinching or otherwise working primarily with the fingers) or feeling." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1353 (S.D.N.Y. 1991) (citing SSR 83-14, 1983 WL 31254, at *1–*2) (internal quotation marks omitted). "'Most sedentary jobs require good use of the hands and fingers' for fine movements such as picking, pinching, holding, grasping, and turning." *Horbock*, 210 F. Supp. 2d at 136 (quoting SSR 96-9p, 1996 WL 374185, at *8)). Moreover, some jobs that can be performed with limited "gross" hand manipulations require unimpaired "fine" hand manipulations, and so the ALJ's omission of Johnson's additional restriction means that he may "not [be able to] do any of the jobs" that the vocational expert described. *See id.* Indeed, after ALJ Singh informed Dr. Sachs of Johnson's "gross" hand manipulation restriction, the vocational expert replied that the limitation excluded one of the three jobs he had said that Johnson could perform. *See* ALJ Hr'g Tr., R. at 139–40.

The Commissioner argues that the error was harmless.[9] I disagree. The Commissioner

points to the SSA's *Selected Characteristics of Occupations*, which, she asserts, shows that the

jobs identified by Dr. Sachs do not require more than "frequent[] . . . fine and gross hand

manipulations." *Cf.* ALJ Decision, R. at 45. Even if the Commissioner is correct, however, the

ALJ did not rely on the *Selected Characteristics of Occupations*, and her decision must "stand[]

or fall[] on the reasons given." *Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 117 (2d Cir. 2006);

*see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). I cannot "assume a hypothetical basis for

the [ALJ]'s determination, even one based in the record." *Zhong*, 480 F.3d at 117.

Of course, "agency errors do not always warrant remand," and in a different context, the

Second Circuit has held that remand of an administrative appeal is "futile (a) when the [ALJ]

articulates an alternative and sufficient basis for her determination; (b) when her reliance on the

erroneous aspect of her reasoning is substantially tangential to her non-erroneous findings; or (c)

when overwhelming evidence in the record makes it clear that the same decision is inevitable."

*Id.*; *see also McIntyre*, 758 F.3d at 148 (applying harmless error analysis to a Social Security

appeal). None of those exceptions applies here. The ALJ explicitly stated that she "[b]ased" her

finding that Johnson was "capable of making a successful adjustment to other work that exists in

significant numbers in the national economy" on "the testimony of the vocational expert." ALJ

Decision, R. at 55. Far from the ALJ "articulat[ing] an alternative and sufficient basis for her

determination," or "overwhelming evidence in the record mak[ing] it clear that the same decision

is inevitable," *Zhong*, 480 F.3d at 117, the vocational expert's inadequate testimony is the only

---

[9] The Commissioner also suggests that the ALJ did not err at all, because Johnson's activities of daily living—which describe regular cooking and use of an iPad—belie his claim that his fine manipulation skills are limited. As I noted *supra* at 13–14, however, "substantial evidence" supports the ALJ's finding that Johnson was restricted in his fine hand manipulations, and that determination "must be upheld." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).

evidence in the record that supports the ALJ's findings with regard to Johnson's ability to perform other work. Nor was the ALJ's error "tangential." *Id.* The mistake was essential to the ALJ's finding that Johnson was "not disabled" because he could "adjust[] to other work," *see* ALJ Decision, R. at 55—a step of the disability determination on which the Commissioner bore the burden of proof. *See Poupore*, 566 F.3d at 306.

When the Second Circuit has deemed an inaccurate hypothetical in a Social Security disability determination to be "harmless," it has done so "because the hypothetical question posed to the vocational expert implicitly (and sufficiently) accounted for [the claimant]'s particular non-exertional limitations." *McIntyre*, 758 F.3d at 148. Specifically, in *McIntyre*, the ALJ's hypothetical did not "explicitly incorporate [the claimant's] limitations in concentration, persistence, and pace." *Id.* at 152. The court held that omission was error, but concluded the error was harmless because the ALJ "explicitly limit[ed]" the hypothetical to "simple, routine, low stress tasks," which "implicitly account[ed] for [the] claimant's limitations in concentration, persistence, and pace." *Id.* (quoting *Winschel*, 631 F.3d at 1180). Furthermore, the Second Circuit held, "substantial evidence in the record demonstrate[d] that [the claimant] c[ould] engage in 'simple, routine, low stress tasks.'" *Id.* Thus, the ALJ's mistake in *McIntyre* did not merit remand because it proved "inconsequential to the ultimate nondisability determination." *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012); *see also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (stating that in the context of "judicial review of administrative decisions," error is harmless when the "decision is overwhelmingly supported by the record").

In the present case, the ALJ's finding that Johnson was "capable of making a successful adjustment to other work" is not "overwhelmingly supported by the record." ALJ Decision, R. at

55; *cf. Spiva*, 628 F.3d at 353. To the contrary, the ALJ's conclusion is only supported by the opinion of the vocational expert, given in response to an incomplete hypothetical. An opinion reliant on an inaccurate hypothetical does not constitute "substantial evidence." *See Winschel*, 631 F.3d at 1181. Because no other evidence supports the ALJ's determination with regard to Johnson's ability to perform other work, her finding of "not disabled" is "not supported by substantial evidence in the record," and must be remanded. *See Greek*, 802 F.3d at 374–75.

## IV. Conclusion

I deny the Commissioner's motion to affirm, and grant Johnson's motion to reverse to the extent that it asks that I vacate the decision of the Commissioner. I remand for further development of the record with respect to Johnson's ability to perform other work that exists in significant numbers in the national economy.

The Clerk shall enter judgment, effect remand to the Commissioner, and close the case.


So ordered.

Dated at Bridgeport, Connecticut, this 1st day of June 2017.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge